Before we begin the argument, I want to raise one issue about confidentiality. Notice that all the briefs are marked non-confidential, save the Compaq brief, which appears to mark confidential things that fall into the category of standard legal argument. It really looks as though Compaq has paid no attention to our rules in this respect. So I would ask you to please review that and, if you can, remove the confidentiality markings, or remove as many of them as possible, and to file a new version of the brief that's in compliance with our standards. Anything you want to say about that? Good morning. Craig Ryan, RAF, on behalf of Compaq. Most, I believe, or almost the vast majority of the designations are at the request of Newcomer Convolve to de-designate all of that material. If they would agree to that, we can re-approach them, but we have in the past requested that they undesignate them, and this is what has been designated as confidential. Well, why don't you discuss that with them? It's hard to see any basis for confidentiality markings here, particularly since the same subjects and the same things are discussed in the other briefs without any confidentiality markings. All right, why don't we start the clock now. Is it pronounced Mayringer? Marringer. Marringer, okay. Mr. Marringer. Good morning, Your Honor. As you may please the Court. Unless the panel has a specific preference, I'll begin today with the intervening rights issue, because it's the only case this law that is issued now on appeal. It's undisputed here that there was an amendment during the re-examination of the 473 patent, the first re-examination of the 473 patent, and that may trigger an intervening rights analysis. But it may not trigger a per se finding of intervening rights. Can I ask you this question, and I'm going to put aside the per se since I don't find that in the district court's opinion. I'm interested in an answer to, I guess, a doctrinal question about the PTO's use of the broadest reasonable interpretation standard. What is the clearest precedent from our court for the proposition, which I think matters here, that the intervening rights analysis depends on comparing the before and after claims as, let's say, construed under Phillips, correctly construed. I'm not quite sure what the right language is, but not under the BRI standard. I think Kauffman and Lathram would both go to that. Even the most recent decision from R.L. Carrier discusses that. And the distinction is the distinction between the scope of what's looked at. Under the MP, the examiner is looking at the claims alone and the specification. Under Lathram, under Kauffman, under R.L. Carrier, the full scope of what's to be looked at under Phillips should be what's looked at by the district court in doing that analysis and looking at the original claims versus the reissued claims. Well, that's not quite true. Assuming that it's not the broadest reasonable interpretation, which seems to me to be correct, and that it is the Phillips standard. It's the Phillips standard with one tweak under Lathram, and that is that in determining what the original claims provided, you look to see what happened in the reexamination proceeding. And if there is there a rejection and an amendment to overcome claim scope, that becomes highly relevant to the interpretation. Not a per se rule, but highly relevant, correct? It can be highly relevant, and I think you have to look at the entire scope of the reexamination to see that, too. Right, but that's a departure from the Phillips rule in the sense that if our sole task were to see what the claims meant before the reexamination, you wouldn't take into account what happened in the reexamination proceeding. And Lathram tells us we have to take into account what happened in the reexamination proceeding. That, in part, is correct. I believe that you could make an argument that the intrinsic record for the original claims would not include the reexamination, and the intrinsic record for the reissued claims would include the intrinsic record. You would still, under Lathram and under Lathram IV, look to the reexamination to see what guidance it might give as to what it is. But as indicated, it should not be a per se indication of what it is. And something along the lines under Phillips of what extrinsic evidence would do for you to look to see whether or not it supports your construction. Yes, but what I'm saying is that under Phillips, if you were trying to construe a claim and you wanted to find out what the claim meant before the reexamination proceeding, you'd look to the standard things, but you wouldn't look to see whether there was a rejection and overcoming the rejection by an amendment to the claim in the reexamination proceeding. And yet Lathram tells us that that's not only relevant but highly relevant. So in that sense, it's a little different than the Phillips process. That's correct, right? Yes, I believe that Lathram would tell you that you can consider the reexamination, and we wouldn't say that you shouldn't consider the reexamination here. What happened in the reexamination was two rejections, starting with a very broad interpretation. By the end of the reexamination, both the applicant and the examiner had come to very much the same issue that had been at issue in the very original application, which was the distinction of the noise between Kaufman and the claim. And ultimately, both the examiner and the applicant in the reexamination indicated that it was a clarifying amendment to add seek. So in and of itself, the fact that there was a rejection in the reexamination would not indicate that this was a substantive amendment. Can I ask you a question about how the three issues before us fit together? I'll ask it this way. Suppose, hypothetically, that we agreed with you about command, we agreed with you about intervening rights, but disagreed with you about user interface. Does the whole case go away, or is the user interface ruling somehow more limited just to Seagate's direct infringement by Seagate? I must say, I was left quite confused about that. Yes, it is a little bit confusing, what the district court did right at the end there with its announcement between command and user interface. Our position would be that the user interface determination and ruling on summary judgment by the district court is limited to Seagate direct infringement alone. It's only limited to the APA and SCSI interface. It does not, our allegations against compact with respect to both indirect infringement and direct infringement rely on the F10 BIOS. Do you have an allegation of indirect infringement against Seagate that would remain even if the Seagate, those two components of the Seagate hard drive were not themselves user interfaces? Yes, absolutely we do. And so you think that the language that the district court used in saying three independent grounds was somewhat imprecise? It absolutely was. And the particular allegation against Seagate with respect to indirect infringement would be based on the Seagate utilities where that's a user interface independent of the APA and SCSI interface. The basis for the intervening rights analysis that the district court gave, the cornerstone of it was going back and trying to substantiate that there had been a substantive change. And that was based on a claim construction of the original claim that would allow it to include spindle motor noise, acoustic noise. If that claim construction is correct, everybody in this case was wrong. The original examiner was wrong to allow the claim to be issued. The re-examiner was wrong to call the claim amendment clarifying. The defendant's own experts in 2008 when they were deposed were wrong when they said that the claim should be construed to exclude spindle motor noise and the technology here in 473-5 was only limited to seat technology. And finally, the defendants themselves were wrong in 2002 when they themselves proposed the construction of the term acoustic noise to specifically exclude spindle motor noise. The re-examiner started with opposition. And we held that as a clarification that could be ignored. The Coffman case is a case where, in fact, there was an indication that it was over and in validation. And almost every re-examination, every re-examination starts with a position that there's a substantial new question of patentability over prior art. And that's exactly where the Coffman case started, was rejecting a position that, in and of itself, that should be enough to say every amendment has to be clarified. That is where re-examinations start, with questioning a new piece of prior art. You can only get a re-examination. Was Coffman a case in which there was a rejection and then an amendment? It's not clear on the record whether or not, under Coffman, whether or not there was a specific rejection. The case didn't go into that level of detail. So, am I correct, then, you're not able to cite a case where there was a specific rejection and amendment, but we nonetheless held that that could be ignored for purposes of determining the original claim scope? This court, the Kumbau case itself in Texas, decided it that way. The Kumbau case looked at this exactly the same way. That's a district court, right? Yes. Yeah, I'm saying, our decisions. Our decisions, your decisions from this court, I mean, the Coffman case, have held the same. But it's not, but you admit in Coffman, it's not clear that there was a rejection. On the record, it indicates that it was over prior references. Whether or not that was, again, what that would be, at least an indication that there would be a rejection there. But that's the only case. Dealing with re-examination, that's the only case that comes to mind right now, and that we cited. Okay. Can I ask you about the commands portion of this case? Assuming that I disagree with you about the user interface and think the district court got that right, do you still have an argument? I think that some of the claims are still that infringing because of the commands portion. I don't follow that entirely because they seem like they're basically all doing the same thing. Their user interface that's outputting commands. So, can you explain that to me? I'm sorry, I may have misunderstood your question. Well, I mean, it's really just a variation of what my colleague asked you. There's a different portion of this case. Assume we agree with you on intervening rights. Assume we disagree with you about user interface. You're still preserving some kind of commands argument for some of the claims but not all of the claims, right? That's all of the claims. The commands element is there. The user interface and the commands issue are two separate issues. Well, that's what I'm trying to ask you about. What is the commands issue, and what products would it impact, and how does it differ from the user interface argument? Because it seems to me that some of the claims that talk about user interface also, they all have the commands thing working through the user interface. So, if you don't have a user interface as properly construed by the district court, then how do you have a commands problem? In other words, the processor that's giving the commands has to have a user interface, right? The processor that's giving the commands, and I see I'm interrupting. Go ahead. But I do want to answer the question. That's where we would disagree with the district court. The district court linked the two issues, the user interface and the commands, and came up with a… So, you don't think that the processor that gives the commands has to have a user interface? We don't believe that the processor that gives the commands has to be the same processor that issues the commands. And that's the link that the court made. In fact, not all the claims even require a processor. Only some of the claims do. Except possibly for Claim 9, whose language is tough for you. No, I don't believe it's the case with Claim 9 either. Claim 9 is a processor, and that would require interpreting the term a to mean that it's a single processor. That's what I meant by tough. This court's precedent would not limit the term a to a single. But what about Claim 1, where it talks about a, but then when it gets to the commands portion, it refers back to the processor. Isn't that kind of a way, a typical way of writing claims to refer to the same processor and not more than one processor? Claim 1 is slightly different. Some of the issues raised by Claim 1 are different, and we have not used Claim 1 and alleged infringement in the same manner. So I do think that we've, even in our brief, made some distinctions about how Claim 1 should be interpreted. But what the district court did with respect to all of the other claims, you can't read in any of the limitations of Claim 1 into the other claims. Okay. We'll give you two minutes for rebuttal. Thank you. Mr. Phillips. Good morning, Your Honor. This is Dan Flees from the court. I'm going to discuss the user interface and intervening rights issue, and my colleague will deal with the commands issue, if that's okay with the court. Do you agree, by the way, that prevailing on the user interface issue does not end the case in toto or even end the case as to Seagate as a defendant? I agree that it doesn't end the case in toto, as I understand it, but it does, in my view, end the case as to Seagate. The district judge dismissed all the claims as to judgment, and he did it on the ground that each was an independent basis for ruling in our favor. And the other side did not in any way raise that as an issue in its appeal. There's no question presented. There's no argument. All we have is a footnote and a reply brief that says, in the event that this case goes forward at the ending court, that portion stays on. I would say they waive their ability to make that particular argument in this particular case. That said, I do think, and I agree with my colleague, that the intervening rights issue is the one that will dispose of the case, and I think in some ways disposes of it most readily, such that, if you're right, there is no case that deals with the situation anywhere close to this one. Even Leitrim and Institut Pasteur are cases that I think are harder in some respects for the defendant in this particular case, because here we have two rejections carefully analyzing each of the bases of the Kohizumi patent, evaluating them on pure intelligibility, looking at every claim element, and concluding that, given the language that's been used here, that this is anticipated. Am I wrong in remembering that every single time the examiner issued the rejections before eventually allowing for the change, the examiner was careful to say the language of the claim does not clearly exclude, was it Kohizumi? Never saying, that is, every single time the examiner either expressly or implicitly relied on the BRI standard, and that then carried through to the ultimate, what you're doing is clarifying, which is kind of the role of the BRI standard, right? This is a little bit unclear, but it seems to me that there's no way to reconcile some effort to incorporate in as a limitation on the intervening rights doctrine of the BRI standard, because that would have been just as true in Leitrim 4, it would have been just as true in Pascal Institute. Well, it depends what the examiner said in each case. I guess I was struck by the language. The examiners, at least in my experience, often do not build in what seemed to me such careful language in describing the grounds of their rejection. Instead, they say, this covers that. They often do a kind of a rote, we're governed by the BRI at the beginning, and then you never hear about it again. The examiner kept coming back to it. Except that if you look, if you carefully study the examiner's analysis of the relationship between Cusimi and this particular patent, what he says in that context is that Cusimi anticipates everything with respect to this, that the inverse relationship, that the acoustics work, and it moves inversely with the speed, and there's a mechanism by which it shifts from one to the other. And therefore, there is no basis for this to be allowed to go forward under these circumstances. And so what do they do? They make a change. I don't see any way that you can describe that change as anything other than substantial in this context, because the same language that caused this court to conclude that there were intervening rights in the prior decisions applies here. It's a clear adjective that significantly narrows the scope of the claim. That's a significant change. The specification consistently distinguishes between steep speed and acoustic noise. There's never a reference. But it never distinguishes between acoustic noise that comes from different things. As far as I can tell, everything in the spec referring to acoustic noise, or at least the acoustic noise that has an inverse relation to speed or time, I always get this confused, I'm sorry, speed, is about acoustic noise generated during the seek process. Right, but that would be just as true for the seek noise as it is for the spindle noise. That's the whole point of the reexamination analysis, is that if you modify the speed either way, you're going to affect both the spindle and the seek noise. So the question is, what do you have? You just asked for acoustic noise. You fall squarely in and are covered by the previous path. So in order to get out of that, they had to make a substantial change. And that's precisely what they did in this particular case. But is there anything in the specification that talks about spindle noise? Isn't it always talking about seek noise? And remember, Column 9 says broadly that this applies to reducing vibration in all kinds of systems. These are claims that are written to be wildly broad, way beyond the specific application to the hard drive under these circumstances for this kind of invention. And that's what you would take. This is meant to be the broadest possible application. And in order to bring it back in, the court significantly reduced, significantly changed, not the court, the plaintiff significantly changed the scope of the claim. I guess under marine polymer, they could have, instead of amending the claim language, they could have said, in our view, it's absolutely clear that the original claim is limited to seek noise rather than spindle noise, right? And they would have been okay. Right, although, as I understand it, their path would have been invalid at that point, right? The examiner having rejected it on the basis that it's anticipated by Koizumi, if they leave it in place under those circumstances, they've got an invalid path. Well, what I'm saying is if all they were doing was a clarification, they could have articulated the clarification without actually amending the claim language. But it does seem to me that once you amend the claim language the way they did, then they have to demonstrate that that's an insubstantial change. And the one thing I did want to say to Judge Romano about the clarifying, and that's in a footnote in passing in the examiner's analysis, and it is far from clear that he is using the term clarifying in that context as distinguished from substantial change. I mean, clarifying used in ordinary parlance would make it clear what was unclear, and it seems to me reasonably obvious at this point that whatever else there may be, acoustic noise is not going to come into it as to whether it includes both spindle noise and seek noise under these circumstances. And then with respect to the user interface, the argument there, it seems to me, is the court interpreted the language clearly. You've got to have a person, and the person has to be acting directly with respect to the device. But the person does not have to be acting directly. It says directly or indirectly. Right. And the court was very clear in explaining what indirectly meant, which is you couldn't use a mouse and you couldn't use a… I think part of your language was at the site of the user, because most software is not that, and software was expressly added to the claim construction. Were you given an opportunity to register disagreement with the addition of that word and you didn't? I'm having a hard time understanding what language captures the notion that the user interface doesn't cover the particular components of your hard drive, with which, through long enough wires or something, the user can interact to make the choice that is the whole point of that piece of the invention. But the way I would answer that, and it may not be an answer because you're looking for specific language in the claim as opposed to… No, no, no, just your language that's making the distinction. The other side argued that user interface meant a device-to-device interface, and Judge Daniels specifically and explicitly rejected that, saying that writes user out of the claim. So in order to have… you have to have some connection, and he made an exception to deal with what he called a pedantic argument, which would be that somehow if you're just using a mouse or something else, that that would be a problem for them. So he gave them that, threw them that bone, and said, no, it would be indirect. But he in no way remotely suggested that indirect was meant to subsume the need for a true user interface to be distinguished from a device-to-device interface, and there's no excuse that what we have is purely a device-to-device interface. Can you just help me understand, and it may not be possible for me to understand this, but what is the distinction between the user interface that allows indirect access to the ultimate thing you're trying to control and a device-to-device interface? The keyboard works through, and I'm not quite sure what the relationship technically is between the screen and the keyboard and the mouse and the screen. I'm having a hard time getting a grip on exactly what this distinction is. With a claim construction that uses the word indirectly, that includes software, which is not actually a physical thing, but that generates something else that is presented to the user. Right, and I guess the place I would ask you to look would be to go back to the specification and look at the diagrams that the patent uses, because the patent diagrams are all of the screen, and they are the kinds of user interfaces that you and I deal with every single day, where you hit a mouse click in order to move a scroll, where you enter a keyboard in order to enter in an item, in order to shift the focus from one side to the other. That was what Judge Daniels concluded was the user interface that this patent reveals, and that it doesn't move all the way down at that point to device-to-device interchanges. And why isn't it because that user interface ultimately is talking to the Seagate hard drive, not covered indirectly? Is it because it has to go through other processors? Yes. Because he said that otherwise, you're saying everything in the computer is now suddenly subject to this claim, and he said that was never the intent, particularly against the specification that seems dramatically more narrow than that. That would be my, I guess, the best answer I have for you, Judge Geronimo. Look at that specification. That clearly doesn't extend to something inside. And even when the expert was handed the device, he said, so now how— Even though the software is inside, and the software is expressly part of the claim construction with an org, software that allows the user indirectly to alter the parameters, that would be a literal part of the claim construction. But that's still not—I mean, first of all, that's not our case. I mean, this is not software. This is hardware, right? So it still doesn't extend to hardware. But you're relying on an admittedly intuitive distinction between user interfaces and some other kind of interfaces, and I keep reading each of the attempts to give a characteristic that captures or defines that intuition, and I find a problem with every one of the characteristics. So I'm struggling to understand, ultimately, what this distinction is. And I guess the answer I would give is to go back to the specification, as I said before, and look at exactly what it is that this invention is designed to get at. And what it's designed to get at is the interplay between the user, the human user, and the ability to make a change on the screen. And after it gets past that, into the computer, that's off-limits. That's the way Judge Daniels read it, and on the basis that that would just be system-to-system. So when I was trying to understand what is the role in the technological advance played by the user interface, I had a hard time finding anything other than a mechanism of giving an instruction, a mechanism of control. So why does that exclude the component of your hard drive that is, in fact—I guess it's programmed to receive a control command? Well, because—I mean, I don't view that—and certainly that's not the way Judge Daniels reviewed or concluded with respect to the scope of this point. He reviewed this not as just simply giving a command and then running it on to the end of the earth. He said there's a command that gets given to the screen and is adopted that way. It can either be directly, because you can touch the screen, presumably, or indirectly, because you go to a mouse or a keyboard. But once it gets beyond that stage, to be sure it's still indirect, but at that stage it becomes something other than a user interface. But the way we are, we're trying to figure out what he meant rather than what the claimant meant, because as I understand it, there was no objection to his construction at the time, right? Although, again, they made the argument that this includes a device and a device, and never objected to it when he said, no, categorically that's just not true. It's much more narrowly limited than that, and explained the very narrow limitation of indirectly. Okay. Thank you, Mr. Phillips. Mr. Landgraf? Thank you. In addition to adopting the arguments made by Seagate, I'd like to discuss the commands component of this report. The commands need to originate from the user interface, and the only user interface left in the case right now is the F10 BIOS on the compact machine that appears as a user during boot up and is available to the user. What do you mean by the commands have to originate from the user interface? I thought the question was whether the very same processor that generates the user interface has to issue the commands to the hard drive to change the voltage or something. And I can see how you might get that out of Claim 9. I have a hard time seeing how you get it out of anything else. Well, a few ways. One is that if all this is repeated, the commands mean the same thing across every claim. Well, of course, what commands does, but that doesn't say that the same processor that generates the commands has to generate the user interface. Well, the command needs to be shaped by a processor. That's how this report construed it. And so if it means the same thing across every claim, we appear to have a concession that it happens in Claim 1 by Mr. Moringer, and it also happens in Claim 9. Our position is it happens across the board in every claim, and that's what Convolve argued to the PTO. But why can't other of the claims be broader and allow more than one processor? Claim 10, for instance, doesn't talk about the user interface and the kind of preamble part, but talks about a user interface for controlling and then an operating user interface that has a separate clause about outputting commands that doesn't seem tied to the user interface. Every claim requires a user interface, and some claims do specify the processor and some do not, but everyone identifies a user interface. And Convolve argued to the PTO in the re-examination in 2008 that the prior RAFIS did not anticipate the claims under review because the RAFIS lacked a separate host computer with a user interface there that issued commands. They made that argument explicitly in the examiner report. Am I remembering right? This is what I'm remembering from your brief, that when you said that, that they made that argument, what you quoted was not actually language that they used, but rather the examiner's characterization of an argument during which the examiner then went on to say something, and that was not actually Convolve's words. And later they came back in response to that, was it January 2010 or something, and then in April of 2010 they came back and said something that, I'll use the word clarify, no pun intended. Convolve did say that, they're not right. Convolve's misception of the title, and Convolve's, which one are you reading from? We're about to read from A5020. The misception of A5020 was that Bray did not enable the disk drive to respond to commands from a host computer for altering seat mode. And they argued that Bray at A5021, Convolve argued that Bray teaches away from the idea that a host computer was used to send commands. So they did bring that to the examiner, and the examiner, they're correct that we quoted the examiner because the examiner's language was clear. This is from A4219, quote, the examiner concurs with Pat Lerner that Bray did not disclose a host processor running a user interface, and that the commands of Bray appear to be generated by modified DSP code internal to the storage device and not via a host processor. Here, the compact machine is a host computer that they were saying didn't exist, that there was no host processor. They tried to correct that. The sections that they sent the court to say nothing to correct the examiner's understanding that Bray did not disclose a host processor running a user interface. And it's undisputed here that the F10 BIOS does not issue commands that that's been construed. So once you hold them to what they told the PTO, what the PTO relied on, under Juergensen and MacCasey, that's the end of the story. And there's no dispute, and they don't claim in this court that the F10 BIOS issues shaped commands as that term has been construed. By the way, do you agree with what I take as, so far, a two-to-nothing agreement that resolving the user interface issue by itself does not end the case? If you resolve it against us. I would agree with that, but I urge you to look at the inverse relation argument, which is a purely argument, undisputed facts, and straightforward. Okay. Thank you, Mr. Laird. Mr. Marancher, you have two minutes. I'll try to get through some of these things very, very quickly. I'll start with the user interface. Most of the issues that I think were raised on the user interface can be dealt with, basically, with the fact that what was done here read out a specific embodiment. The patent talks about the user interface, the disk drive engine being done on either processor 25, which is the host PC, or processor 73, which is the disk drive processor. I apologize. And what the district court did here was limit us improperly to the host PC processor, did not look at any of the evidence with respect to user interface, and limit us there. That completely reads out the embodiment, where the disk drive engine, which generates the user interface and generates the command, can be done on the disk drive processor itself. With respect to the machine-to-machine argument, that was a mischaracterization about what we argued during the device-to-device. We did not argue as that argument was specifically that the device, the term user, could include commands that were actually initiated by a device, and the district court said it would just have to be a person. That's reflected in the plain meaning of the claim construction. The district court should apply that plain meaning. Can I ask you, can you give me some words that describe how to distinguish device-to-device interfaces from your conception of user interface? And don't just repeat the claim construction words, please. I think what Judge Rundle, what you had said with respect to mechanisms of control, it should be interpreted broadly. The characterization of our patent only talking about the GUI and all the figures, and that's what all should be relied on, limits us right back to the claims as having only a GUI. And that is not where we are. Figure one talks about and shows the context of this patent, and it's broadly talked about as being a disk drive in the context of a PC. One of ordinary skill in the art is going to understand that getting from the user to the site of control is going to involve many, many different types of interfaces. And the user interface that's contemplated by the patent and would be understood by one of ordinary skill in the art is the ability and the mechanism of control that's going to allow you to put that instruction in to alter parameters. Okay. I think we're out of time. Thank you, Mr. Merringer. Okay. Thank you. Thank all counsel. The case is submitted. Thank you.